UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FERNANDO DIAZ LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-30200-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING DECISION OF COMMISSIONER AND DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 18 & 23)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

This action seeks review of a final decision of the Acting Commissioner of Social

Security ("Commissioner") denying the application of Plaintiff Fernando Diaz Lopez

("Plaintiff") for Supplemental Security Income ("SSI").[1]  Plaintiff applied for SSI on August 29,

2012, alleging disability on the basis of depression, suicidal and homicidal ideation,

schizophrenia, bipolar disorder, and anxiety and a January 1, 2008 onset of disability (A.R. at 17,

65, 152-60).  The application was denied initially and on reconsideration (*id*. at 77-83, 88-90).

After a hearing on December 2, 2013, the Administrative Law Judge ("ALJ") found that Plaintiff

was not disabled and denied Plaintiff's claim (*id*. at 11-34).  The Appeals Council denied review

---

[1] A copy of the Administrative Record (referred to herein as "A.R.") has been filed with the
court under seal (Dkt. No. 12).

(*id*. at 1-8), and, thus, the ALJ's decision became the final decision of the Commissioner.  This appeal followed.

Plaintiff seeks reversal of the Commissioner's denial of his claim on the grounds that the ALJ erred by committing a combination of legal and factual errors.  The Commissioner has moved to affirm on the grounds that the ALJ's decision is legally sound and supported by substantial evidence.  Pending before this court are Plaintiff's Motion for Order Reversing Decision of Commissioner (Dkt. No. 18) and the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Dkt. No. 23).  The parties have consented to this court's jurisdiction (Dkt. No. 14).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court will deny Plaintiff's motion and grant the Commissioner's motion.

II.     FACTS

A.  Educational and Occupational History and Daily Living Activities

Plaintiff was 38 years old when he filed his application (A.R. at 152).  He graduated from high school in Puerto Rico and thereafter attended a year of technical school (*id.* at 41).  He was employed in Puerto Rico as a security guard from 1994 through 1997 and worked in maintenance from 1997 through 2001 (*id.* at 206).

In an October 10, 2010 function report submitted to, and translated by, the SSA, Plaintiff reported that he watched TV and played videogames and he had no problems engaging in these activities, nor did he have problems attending to his personal needs.  He went to medical appointments but otherwise stayed home.  He did not help around the house or care for anyone or any pets or other animals.  He was able to go shopping occasionally if he needed to do so, and he could manage his financial affairs.  He spent time with others on the phone and in person, although he only occasionally spent time socially with friends.  He did not need to be reminded

2

to go places, nor did he need someone to accompany him.  He had trouble with concentration and following instructions, got along well with authority figures and had not been fired from a job because of problems getting along with people.  He did not know how to manage stress, did not handle changes in routine very well, and had visual and auditory hallucinations (*id.* at 212-19).  The function report form was signed by Plaintiff's mother on October 10, 2012 (*id.* at 219).

     B.  <u>Medical Records Related to Mental Impairments</u>[2]

     1.  Medical Records from Puerto Rico

On August 5, 1999, Plaintiff was seen at a psychiatric hospital for evaluation and psychiatric assessment after he held a knife to his wife's throat (*id.* at 715, 717).  He reported that he was depressed, had visions, was neglecting to take his medications, and wanted to jump off of a bridge (*id.* at 715).  He had told his mother that he was going to see, and empathized with, the devil, that he felt something inside him telling him to do bad things, and that he has to do them to calm himself down.  He was judged by the hospital staff to be at high risk of suicide (*id.* at 719).  He had no past history of hospitalizations, and was not taking psychotropic medications (id. at 718, 726).  He was discharged with a referral for outpatient treatment (*id.* at 720).

On March 28, 2007, he was admitted to First Hospital Panamericano with an admitting diagnosis of schizophrenia NOS (not otherwise specified).  He spent 5 days in the hospital before he was discharged with a diagnosis of major depressive disorder (*id.* at 415, 416).  The records from this hospitalization are largely illegible (*id*. at 416-19), with the exception of a physician's

---

[2] The record contains some evidence of physical impairments in the form of a heart condition and degenerative disc disease but Plaintiff has not objected to the ALJ's assessment that these impairments were not severe and did not give rise to any exertional limitations (A.R. at 22). Accordingly, the court need not and does not address Plaintiff's physical impairments.

note, dated March 28, 2007, which describes Plaintiff as a 33 year old man with a longstanding history of psychiatric illness going back to age 15, presumably schizophrenia.  The physician noted that Plaintiff had decided to stop taking his medication and was under significant stress after separating from, then assaulting, his wife.  Plaintiff told the doctor that he heard voices telling him to kill or injure his wife, saw shadows at times, and was afraid he would kill someone (*id.* at 655).

On or around August 26, 2008, Plaintiff was voluntarily hospitalized.  The diagnosis was schizoaffective disorder and the reason for the commitment was problems with the criminal/legal system (*id.* at 619-22, 626).  He reported that he was seeking treatment because he had been depressed and isolated for a month.  He had hit his mother, wife, and daughter and wound up in court.  He reported auditory hallucinations telling him to kill himself or to hurt other people (*id.* at 623, 626).  He was not employed (*id.* at 631).  He was stable two days later at the time of discharge and understood that he needed to take his psychiatric medications (*id.* at 639).

Plaintiff was seen on February 23, May 18, August 8, and December 19, 2011, and on May 19, 2012 by Eduardo Rodriguez Falche, M.D., for follow up care.  In February 2011, plaintiff reported some hallucinations and irritability.  Dr. Falche judged his thought patterns to be logical, coherent, and relevant, and his affect dull.  The doctor assigned a global assessment of functioning ("GAF") score of 50 on the GAF scale of 1 to 100,[3] and the doctor increased Plaintiff's dosage of Risperdal (*id.* at 318).  By May 2011, Plaintiff's mood was calm and he was

---

[3] A GAF score of 41-50 indicates: "**Serious symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders 34 (American Psych. Assoc., 4th ed., 2000) ("DSM-IV").

stable, resulting in an increased GAF score of 60 (*id.* at 317).[4]  In August 2011, Dr. Falche noted that Plaintiff was doing well with his "diagnosis at baseline."  He remained calm with a GAF score of 60.  The report for December 2011 was essentially the same (*id.* at 315-16).  In March 2012, Plaintiff had problems with his health and had not been able to obtain his medications for the last three months.  He reported seeing shadows and some suspiciousness, and told Dr. Falche that he was moving to the United States to his mother's home next month.  Dr. Falche assigned Plaintiff a GAF score of 55 (*id.* at 314-15).  In July 2012, Christian Hernandez, M.D., noted that Plaintiff's though patterns were logical, coherent, and relevant, and that he was oriented. Plaintiff was alert and calm and his affect was adequate.  Dr. Hernandez assigned Plaintiff a GAF score of 60 (*id.* at 314).

2.      Medical Records from Massachusetts

On August 29, 2012, with Plaintiff having followed through on his plan to leave Puerto Rico and establish residency in Massachusetts, he began treatment at the Gandara Mental Health Center ("Gandara") (*id.* at 380).  His intake assessment reflects that Plaintiff reported that he had come to Gandara to continue his treatment for schizoaffective disorder (*id.* at 369).  Plaintiff reported that he moved to Massachusetts to be with his mother and his two children.  He was currently unemployed because of his disorder and relational problems.  He reported that "he cannot be around people, he describes his symptoms as a fire bowl that can erupt at any moment, he hears voices an[d] can see shadows" (*id.*).  He indicated that he did not want to work and did not want help finding work (*id.* at 371).  He enjoyed watching TV and playing video games, and reported no limitations in activities of daily living (*id.* at 370).  He was taking Risperdone,

---

[4] A GAF score of 51-60 indicates:  "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 34.

Benztropine, Fluoxetine, and Prazosin HCL with no reported side effects (*id*. at 372). His appearance was within normal limits; he was cooperative but nervous and anxious; his speech, mood, affect, intellectual functioning, insight, and judgment were within normal limits; he reported auditory and visual hallucinations; his thought content was persecutory and guarded; and his thought process included flight of ideas (*id*. at 374). Plaintiff's GAF score at intake was assessed at 59 (*id.* at 359).

The plan for treatment at Gandara was for cognitive behavioral therapy twice monthly with licensed social worker Claudia Rexach to help Plaintiff understand and control his symptoms, coupled with a continuation of his medications so that he would be able to stabilize and reach a functional stage on a daily basis (*id.* at 378, 380, 381). Plaintiff also saw advanced practice registered nurse Peter Bourque at Gandara every other month beginning on October 16, 2012. Mr. Bourque diagnosed anxiety and schizoaffective disorder and prescribed psychiatric medication (*id.* at 362-68).

Plaintiff chose to cease treatment at Gandara in June 2013, informing the staff at Gandara that he was going to seek treatment at another center (*id*. at 359). Plaintiff's discharge summary, which he signed, reflects that Plaintiff had been stable for the last 6 months and compliant with his treatment and its goals. He had been functioning well inside and outside his home. His anger had decreased and his psychotic symptoms were no longer active. His GAF score at discharge was reported as 65 (*id*. at 359-60).[5]

---

[5] A GAF score of 61-70 indicates: "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." DSM-IV at 34.

According to records submitted to the SSA, Plaintiff was incarcerated at the Hampden County Sheriff's Department and Correctional Center ("Ludlow Correctional Center") beginning on or around October 1, 2012 (*id*. at 321). During his admission screening, Plaintiff reported that he had auditory and visual hallucinations and schizophrenia and was on medication. He was oriented to time and place and was not combative. He reported that he did not have suicidal intentions, but had tried to kill himself three times in the past. Plaintiff did not appear anxious or depressed (*id.*) He reported that he was receiving outpatient mental health treatment at Gandara (*id.* at 325). Attendant Ivette Richardson, whose credentials are not apparent from the records, conducted a forensic survey of Plaintiff's mental status on October 2, 2012. The survey was generally positive. Plaintiff was reported to be oriented in all spheres, able to concentrate, with a logical thought process and a stable mood. He reported that he had tried to kill himself three times many years ago by overdosing on pills, but denied any present intent or plan to injure himself or anyone else. He was taking Risperdal, Cogentin, and Prozac, and reported that he had been on psychiatric medication since 1994. He reported that, if he stopped taking his medication, he would hear voices very clearly and constantly, but that the voices were at a minimum at that time because he was taking his medication (*id.* at 333-34, 337). Plaintiff told Ms. Richardson that he had not worked in over 4 years and that when he was working he had many problems with his co-workers because of the instability of his moods (*id*. at 339). Plaintiff was discharged from the Ludlow Correctional Center before any follow-up psychiatric care was provided (*id.* at 338).

Plaintiff initiated weekly counseling at Valley Psychiatric Services, Inc. on August 12, 2013 with social worker and therapist Luz M. Rivera. At the initial assessment, he reported that he suffered from bipolar disorder, depression, hallucinations, and schizophrenia (*id.* at 580, 583).

He identified his mother as his support relationship and indicated a good relationship with his family (*id*. at 583).  He reported that he had been prescribed the following psychiatric medications by Mr. Bourque:  Prazosin for insomnia; Benztropine for psychosis; Fluoxetine for depression; and Risperdone as an antipsychotic.  There were no reported side effects (*id.* at 586).  According to the notes, Plaintiff mentioned that he was not taking his medications and that it was sometimes difficult to control himself (*id.* at 598).  Nonetheless, Ms. Rivera assessed his appearance, speech, affect, perceptions, thought content and process, intellectual functioning, orientation, memory, insight, and judgment as within normal limits.  She indicated that he appeared rigid, tense, and anxious (*id.* at 588).  Notwithstanding prior denials of physical or sexual abuse (*see, e.g., id.* at 347, 370), on this occasion Plaintiff reported molestation by a cousin when he was 10 years old (*id*. at 597).

Plaintiff was scheduled for an October 25, 2013 psychiatric evaluation at Valley Psychiatric Services, Inc. (*id*. at 580).  Handwritten notes of that consultation are difficult to read, but it appears that Plaintiff reported a longitudinal history of mental illness that was generally consistent with his prior reports (*id.* at 606).  The notes from October 25, 2013 are not signed, but medications were prescribed for Plaintiff on that date by Candace L. O'Brien (*id.* at 608).

C.  <u>Opinion Evidence</u>

1.  EAEDC Medical Report[6]

On August 15, 2012, shortly after Plaintiff arrived in the United States, physician Martin-Hernandez examined Plaintiff in connection with an application for EAEDC benefits.  The

---

[6] EAEDC stands for Emergency Aid to the Elderly, Disabled, and Children, a Commonwealth of Massachusetts benefits program.

resulting report provides that Plaintiff complained of schizophrenia, anxiety, and depression (*id*. at 356).  The doctor concluded that Plaintiff had mental health impairments that affected his ability to work and were expected to last for more than a year (*id*. at 358).

### 2.   UMMC Disability Evaluation Services

On October 18, 2012, Plaintiff was evaluated at UMMC Disability Evaluation Services by psychologist Sheree Estes, Ph.D. (*id*. at 347).  Plaintiff reported mental health, medical, family, and educational and vocational histories that were generally consistent with his prior recitations of his history.  He confirmed to Dr. Estes that he was treating at Gandara with someone named Peter and engaged in counseling every two weeks with someone named Claudia (*id.*).  Dr. Estes diagnosed major depressive disorder with a question of psychotic tendencies and anxiety disorder with a question of panic tendencies with a psychotic disorder to be ruled out (*id.* at 349-50).  Administration of a mini-mental status examination produced a score of 21 out of 30, which would be considered in the "mildly impaired range" (*id.* at 349).  Dr. Estes reported that Plaintiff's problems with the mini-mental status examination were that he did not know the day, date, or month, had difficulty with his address, and could not spell the word "mundo" backwards (*id.*).

### 3.   Non-examining Consultative Disability Determinations

On November 23, 2012, in connection with Plaintiff's SSI application, psychologist Brian O'Sullivan, Ph.D., concluded, based on a record review, that Plaintiff was not disabled. Dr. O'Brian noted a history of depression, schizophrenia, bipolar disorder, anxiety, and suicidal and homicidal behaviors (*id*. at 57).  He concluded that Plaintiff had a severe medically determinable mental health impairment that did not precisely satisfy the diagnostic criteria for schizophrenia, paranoid, with other disorders (*id*. at 58).  Concluding that Plaintiff's report of his

daily living activities and the medical records indicated better functioning than the "worst psych allegations," Dr. Sullivan found that Plaintiff had moderate restrictions in his activities of daily living; moderate activities in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration (*id.*).

On reconsideration, psychologist J. Litchman, Ph.D., also indicated that a medically determinable impairment was present that did not precisely satisfy the diagnostic criteria for schizophrenia, paranoid with other psychotic features (*id.* at 70). He concluded, based on his review of the records, that there had not been any real confirmed psychotic episodes and that Plaintiff was in control especially when he was compliant with taking his medications (*id.*). As did Dr. O'Sullivan, Dr. Litchman found that the reports of Plaintiff's activities of daily living and his medical records indicated inconsistencies with Plaintiff's claims of mental impairment. Dr. Litchman concluded that Plaintiff had mild restrictions in his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and had not experienced repeated episodes of decompensation of extended duration (*id.*).

4. Valley Psychiatric Services, Inc. Mental Impairment Questionnaire

On November 18, 2013, Ms. Rivera completed a mental impairment questionnaire that was also signed by Paul Redstone, M.D. Ms. Rivera noted that Plaintiff presented with schizophrenia, visual and auditory hallucinations, anxiety symptoms, bipolar disorder, major depressive disorder, and sleep disturbance (*id.* at 600). In a checklist of signs and symptoms, she indicated that Plaintiff exhibited impaired impulse control; generalized persistent anxiety; mood disturbance; pathological aggressivity; persistent disturbances of mood or affect; bipolar

symptoms; bipolar syndrome with full symptomatic picture of both manic and depressive syndromes; intense and unstable interpersonal relationships, and impulsive and damaging behavior; hallucinations or delusions; motor tension; and sleep disturbance (*id.* at 601).  Ms. Rivera concluded that Plaintiff would be seriously limited in his ability to deal with the stress of semiskilled or unskilled work because of his problems forging interpersonal relationships, his aggressive behaviors, and his inability to control himself.  She found that he would be seriously limited in his ability to interact appropriately with the general public, maintain socially appropriate behavior, or use public transportation because he was unable to be around other people without feeling anxiety and nervousness (*id.* at 603).  Overall, Ms. Rivera assigned Plaintiff a GAF score of 50 (*id.* at 600).  She concluded that Plaintiff had marked restrictions in activities of daily living; extreme difficulties in maintaining social functioning; mild to no difficulty in maintaining concentration, persistence, or pace; and that he had had one or two episodes of decompensation within a twelve month period, each of at least two weeks duration (*id.* at 604).

### 5.  Hearing Testimony and Mother's Statement

Through an interpreter, Plaintiff testified at the hearing that the last job he held was as a maintenance worker at a cemetery or a funeral home cutting grass (*id.* at 41).  He had problems with his co-workers at this job.  They made fun of him, so he grabbed a shovel and wanted to hit one (*id.* at 43).  He got the job because a friend of his wanted to help him, and they were patient with him, but he had a lot of problems (*id.* at 47).  He previously worked in construction, but he had a problem with a female engineer, whom he also wanted to assault (*id.*).  He had problems with his co-workers at each of his jobs (*id.*).  He had a criminal record of assault and battery

committed when he was not taking his medications and he was on probation on the date of the hearing (*id.* at 42).

He lived with his mother and his children, a daughter aged 19 and a son aged 15, in an apartment (*id.* at 42-43). He spent his days locked in his room, wearing headphones so that he could not hear the voices that were always talking to him. He had heard the voices ever since he could remember. His medication calmed the voices down, but they were always there (*id.* at 44, 46). He said he did not like to leave the house because he did not like the way people looked at him. If he went to a store or used public transportation, he would look at the floor or his cellphone to distract himself (*id.* at 44). He had not tried to find work in Massachusetts because he did not like the way people looked at him (*id.* at 46). He reported that he sometimes didn't take his medications because they were very strong and he got acid in his stomach and they made him sleepy, but that the medication he was taking at the time of the hearing was helping him "a little bit" and he wanted to continue testing new medications to try and get better. He needed his mother to remind him to take his prescriptions (*id.* at 45).

Plaintiff's mother was present and prepared to testify and the ALJ indicated that he was willing to hear her testimony (*id.* at 47). Plaintiff's counsel told the ALJ that the mother's testimony would substantially duplicate a letter she had written, and decided against calling her (*id.*). In her letter, Plaintiff's mother represented that Plaintiff had a history of schizophrenia, bipolar disorder, auditory and visual hallucinations of commandos telling him to do things, depression, anxiety, aggressiveness, suicidal and homicidal ideation, and insomnia. He had had problems with conduct in school, which increased in severity as he grew older. Plaintiff's mother reported that he had suffered various crises in his condition because he forgot to take his medication. His hallucinations had required him to be hospitalized on various occasions. Even

when he took his medications, they did not suppress all of his hallucinations.  He had to be monitored at all times to ensure he tended to his personal hygiene, attended appointments, and took his medication.  When he was taken out shopping for clothes or "primary need articles," he was more attracted to objects that shone or reflected light, such as flashlights.  At home, he used his headphones at the highest possible volume to reduce the voices that he heard all of the time and isolated himself in his room, locked the door, and played video games (*id.* at 613).

Following Plaintiff's testimony, Larry Takki, an impartial vocational expert, summarized Plaintiff's vocational history as one in which Plaintiff had primarily worked at unskilled jobs. His past employment in construction would have been performed at a heavy to very heavy exertional level, while the maintenance work at the cemetery was performed at a medium or light exertional level (*id.* at 48-49).  Mr. Takki noted that Plaintiff's employment history also included work as a security guard, which would be classified as a semi-skilled position performed between the light to medium level in exertional terms (*id.* at 49).

Mr. Takki was asked in a hypothetical question to assume a residual functional capacity ("RFC") of an individual of the Plaintiff's age and with his educational background and past work experience who had no exertional limitations, but would be limited to simple, routine, repetitive one to two step tasks which would require concentration for up to a two hour time period; required no interaction with the general public and minimal contact or interaction with co-workers, no more than occasional changes in the work routine, and no English language communication skills.  In response to this question, Mr. Takki testified that this hypothetical person would be able to perform Plaintiff's past work in construction or maintenance because these positions typically do not require work as a member of a team, and the tasks can be demonstrated rather than described in English.  The ALJ then altered the hypothetical by

inquiring whether these positions in construction and maintenance would remain available if the individual's impairments would result in him missing work approximately 4 times a month or being off task approximately 25 percent of the workday.  The vocational expert responded that these factors, singly or in conjunction, would result in no work being available (*id.* at 49-50).

    A. DISCUSSION

       A. Standard of Review

    The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  42 U.S.C. § 1383(c)(3). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (per curiam)).  Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)).  "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Id.*  So long as the substantial evidence standard is met, the

ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

B. <u>Standard for Entitlement to SSI</u>

In order to qualify for SSI, a claimant must demonstrate that he or she is disabled within the meaning of the Social Security Act. A claimant is disabled for purposes of SSI if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 416.920. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See* 20 C.F.R. § 416.920(a)(4). *See also Goodermote v.*

*Sec'y of Health & Human Servs,* 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See* 20 C.F.R. § 416.920(e). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "Work-related mental activities generally . . . include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id*. at *6.

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

C. The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 29, 2012, the application date (A.R. at 19). At the

16

second step, the ALJ found that Plaintiff had certain severe impairments, consisting of

schizoaffective disorder and depression with psychotic features (*id.*).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed impairments in

Appendix 1 (*id.* at 23).  In order to determine whether Plaintiff's mental impairments met or

medically equaled the criteria of any listed impairment, the ALJ asked whether Plaintiff's mental

impairments resulted in at least two of the following impairment-related functional limitations:

marked restriction of activities of daily living, marked difficulties in maintaining social

functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated

episodes of decompensation, each of extended duration.  *See* 20 C.F.R. § Pt. 404, Subpt. P, App.

1.  The ALJ found that Plaintiff did not meet the criteria because Plaintiff had only a mild

restriction of his ability to engage in activities of daily living, moderate difficulties in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence,

or pace, and no episodes of decompensation of extended duration (A.R. at 23-24).

Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform a full

range of work at all exertional levels, but with the following non-exertional limitations:  he was

limited to work involving simple, routine, repetitive 1-2 step tasks which required concentration

for 2-hour time periods and no more than occasional changes in routine, no interaction with the

general public and minimal contact or interaction with co-workers, and no English language

skills (*id.* at 24).  At step four, relying on the vocational expert's testimony, the ALJ determined

that the claimant was capable of performing past relevant work as a construction laborer or

maintenance worker (*id.* at 27).  Thus, the ALJ was not required to, and did not, reach step five

of the analysis.

D.  Plaintiff's Objections

Plaintiff contends that the ALJ erred by (1) making a credibility determination that was not supported by substantial evidence; (2) failing to give controlling weight to opinion evidence from a treating medical source and failing to appropriately weigh evidence from an independent consultant and a treating medical source; (3) failing to address the statement by Plaintiff's mother, who is Plaintiff's primary caretaker; (4) failing to develop the record as to Plaintiff's reasons for changing mental health care providers in 2013; and (5) failing to require translation of certain medical records provided to the SSA in Spanish.  The court will address these contentions in turn.[7]

1.  The ALJ's Credibility Determination was Based on Substantial Evidence

The ALJ was required to follow a two-step process to evaluate the credibility of Plaintiff's claimed symptoms and functional limitations.  "At the first step, the [ALJ] must determine whether there exists an impairment that could reasonably be expected to produce [Plaintiff's] . . . symptoms."  *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 161 (D. Mass. 2010) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)).  In the instant case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms (A.R. at 26).  In other words, he found that Plaintiff's schizoaffective disorder and depression with psychotic features could reasonably be expected to produce audio and visual hallucinations and significant behavioral and adaptive problems.

As a second step, once the ALJ found that Plaintiff had such medically determinable impairments, he was required to "evaluate evidence of the intensity and persistence of the

---

[7] In its review of Plaintiff's objections to the ALJ's decision, the court has revised the order in which they appear in Plaintiff's memorandum because the ALJ's decision to accord no weight to certain medical opinion evidence was dependent on his credibility analysis.

symptoms, including statements from the claimant." *Johnson v. Colvin*, Civil Action No. 13-40003-TSH, 2016 WL 4639134, at \*10 (D. Mass. Sept. 6, 2016) (citing 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1)).  "However, a claimant's subjective description of symptoms alone cannot establish disability; the ALJ also must consider any other available evidence, including the objective medical evidence, to determine whether the claimant's testimony is consistent with the remainder of the record." *Id.* (citing 20 C.F.R. §§ 404.1529(a), (c); 416.929(a), (c)).  The ALJ's credibility determination "is entitled to substantial deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987).  To evaluate symptoms that are to a significant degree subjective, as are Plaintiff's symptoms, the ALJ should "investigate all avenues presented that relate to subjective complaints." *Avery v. Sec'y of Health of Human Servs.*, 797 F.2d 19, 28 (1st Cir. 1986).

The ALJ identified two significant factors that he found weighed against the claimant's credibility regarding the severity of his symptoms and the related functional limitations.  First, he found that the record "clearly establishes that the claimant's condition improves when he is compliant with his medications" (A.R. at 25).[8]  There is substantial evidence in the record to support the ALJ's finding that Plaintiff's condition improved when he took medication prescribed for his mental health impairments, and that his hallucinations and related behavioral problems returned with full force when he ceased doing do so.  According to the records, Plaintiff's psychiatric hospitalizations in Puerto Rico occurred when he stopped taking his medication (A.R. at 639, 665, 718).  While he was under the care of Dr. Falche in Puerto Rico,

---

[8] An individual for whom treatment restores the ability to work is not under a disability.  *See Connolly v. U.S. Social Sec. Admin., Comm'r*, Civil No. 08-cv-509-JD, 2010 WL 148137, at \*\*4-5 (D.N.H. Jan. 14, 2010) (citing SSR 82-59, 1982 WL 31384, at \*1 (1982)).

he was calm and stable, with GAF scores of 60, indicating moderate symptoms, when he was

taking his medications, but suffered from hallucinations and irritability and was deemed by his

care providers to be exhibiting serious symptoms of impairment when he was not (*id.* at 314-18).

His records from Gandara and the Ludlow Correctional Center also reflect that his hallucinations

and related functional limitations were substantially controlled by medication (*id.* at 319-42, 359-

414).  Plaintiff has not argued that there was any reason why he could not take the medications

prescribed for him, and his recent psychiatric records from Gandara and Valley Psychiatric

Service indicate that he did not suffer from serious side effects from those medications (*id.* at

372, 586),[9] nor has he contended that he was unable to pay for them.  *See Connolly*, 2010 WL

148137, at *9 ("One justification for not seeking medical care may be the inability to afford

treatment and the lack of access to free or low-cost medical services.").  Accordingly, there was

substantial record evidence to support the ALJ's refusal to fully credit Plaintiff's account of the

severity of his symptoms and functional limitations because: (1) the records showed that Plaintiff

generally was compliant with medical advice and took his prescriptions; and (2) Plaintiff's

account did not match up with medical records that consistently showed controlled symptoms

and an improved level of functioning when Plaintiff took his medication (A.R. at 25).

Second, the ALJ found that there was "significant evidence of symptom exaggeration

when [Plaintiff] spoke with medical practitioners related to a benefit claim or in the months

immediately preceding the hearing" (*id.* at 25).  The ALJ noted that Plaintiff's records from

Gandara reported a significant improvement in Plaintiff's symptoms and functioning within and

outside of his home.  His consultative examination with Dr. Estes in connection with his

---

[9] Plaintiff testified at the hearing that his medications were strong and caused acid reflux and
made him sleepy (A.R. at 45).  He also reported acid reflux as a side effect of medication while
he was incarcerated at the Ludlow Correctional Center (*id.* at 339).

application for EAEDC benefits was well into his course of treatment at Gandara, by which time the reports of his mental health condition indicated only moderate impairment.  When he went to the consultative examination, however, he was accompanied by his mother, and he reported visual hallucinations and auditory hallucinations telling him to hurt himself and significant restrictions in his daily living activities.  He also exhibited an inability to perform simple memory tasks.  Although Plaintiff denied problems with sleep, his mother indicated to Dr. Estes that he had such problems (*id.* at 348).

Further, the ALJ noted, Plaintiff's June 24, 2013 discharge summary from Gandara indicated that he had been stable for six months and increased his functionality in the outside world, and that his psychotic symptoms were no longer active.  He had gone from a GAF score of 59 at intake to a GAF score of 65 on discharge (*id.* at 359).   Some six weeks later, on August 12, 2013, when Plaintiff had his initial appointment with Ms. Rivera, his condition, according to his account of his symptoms to Ms. Rivera, had, as characterized by the ALJ, "deteriorated precipitously" (*id.* at 25).  By November 2013, when Ms. Rivera completed the mental impairment questionnaire also signed by Dr. Redstone, Plaintiff's condition had reportedly deteriorated further despite the fact that he was reportedly taking his medications.  He was, according to the questionnaire, "presenting [with] schizophrenia, visual and auditory hallucinations, anxiety symptoms, bipolar disorder (swing moods), major depressive disorder, and sleep disturbance (insomnia)," all of which were expected to last for at least one more year.  He was assigned a GAF score of 50, and reported to have marked restrictions in activities of daily living and extreme limitations in maintaining social functioning (*id*. at 600, 604).  The ALJ concluded from the conflict between the Gandara records when compared to Plaintiff's reports of his symptoms and functional limitations to Dr. Estes and Ms. Rivera, that the latter were

"aberrations without credibility" intended by Plaintiff to improve his chances of obtaining SSI benefits (*id.* at 25-26).

In *Orman v. Astrue*, 497 Fed. Appx. 81 (1st Cir. 2012) (unpublished), the First Circuit held that an ALJ erred by relying on stray comments in medical records to conclude that a claimant was malingering where "none of these physicians ever indicated that they believed that claimant was malingering or exaggerating his pain." *Id.* at 85 (emphasis omitted). Plaintiff says the ALJ in the instant case committed the same error by finding that Plaintiff was exaggerating his symptoms to obtain benefits when no treating care provider had expressed any doubt about Plaintiff's symptoms, by citing an absence of objective medical findings supporting Plaintiff's claims when the existence of hallucinations is not susceptible to objective proof, and by placing too much weight on the GAF score of 65 in the Gandara discharge summary (Dkt. No. 19 at 9-14, 16-17).

Contrary to Plaintiff's contention, the ALJ's ruling appears to be consistent with the Social Security Ruling in effect at the time that governed the factors an adjudicator was directed to use for purposes of assessing a claimant's credibility. *See* SSR 96-7p, 1996 WL 374186.[10] In a case such as this one, where "the individual's statements about the intensity, persistence or functionally limiting effects of . . . symptoms are not substantiated by objective medical evidence," the ALJ was directed to consider the entire case record, including "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual." *Id.* at *2. "One strong indication of the credibility of an individual's statements is their consistency both internally and

---

[10] In 2016, SSR 96-7p was superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).

with other information in the case record." *Id.* at *5.  The ALJ properly relied on this factor, and

on Plaintiff's longitudinal history of mental health treatment, *see id.* at *6 (effects of symptoms

can often be clinically observed), in assessing the credibility, or lack thereof, in Plaintiff's

statements about the severity of his symptoms.  The ALJ did not find that Plaintiff invented his

mental impairments or his symptoms.  He credited that Plaintiff suffered from severe

schizoaffective disorder and depression with psychotic features (A.R. at 19).  He found that,

without medication, Plaintiff experienced auditory and visual hallucinations and anxiety that

would interfere with concentration, and that he had difficulty with coworkers and others outside

of his family (*id.* at 23).  He nonetheless found that the statements Plaintiff made to Dr. Estes and

Ms. Rivera about the *severity* of the symptoms caused by his mental impairments, at the point in

time he when spoke with them, were not credible, and he inferred, based on the timing of those

statements, that Plaintiff had an ulterior motive for exaggerating his symptoms when he made

these statements.  The ALJ in the instant case is not alone among SSA adjudicators in having

based a credibility assessment on inconsistencies in medical records that could be interpreted as

showing that a claimant was attempting to present himself as more impaired than he was for

purposes of obtaining benefits.  *See White v. Colvin*, No. CA 14-171 S, 2015 WL 5012614, at

*11 & n.17 (D.R.I. Aug. 21, 2015) (substantial evidence supported ALJ's rejection of IQ scores

purporting to establish mental retardation when those scores were inconsistent with other record

evidence of the claimant's intellectual functioning).

     In 2016, the SSA issued SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), superseding

SSR 96-7p and providing revised guidance about the factors and process by which an SSA

adjudicator is instructed to evaluate claimant credibility.  For purposes of evaluating the

credibility of a claimant's subjective statements about symptoms and functional limitations, SSR

16-3p directs adjudicators to, among other things, "compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances." *Id.* at *8. This is precisely what the ALJ did in this case, and requiring this analysis is at least implicit in the relevant provisions of SSR 96-7p, which focus on consistency as an important factor in assessing claimant credibility. Implicit in many credibility determinations made when an ALJ declines to fully credit a claimant's subjective complaints of pain or other symptoms is a finding that the claimant is engaging in some degree of exaggeration. "Here the ALJ explained in detail his rationale for disbelieving Plaintiff." *Botelho v. Colvin*, 153 F. Supp. 3d 451, 463 (D. Mass. 2015). "Substantial evidence supports the ALJ's finding that Plaintiff's statements about [his symptoms and] and ability to work were not fully credible." *Johnson*, 2016 WL 4639134, at *11.

Moreover, even if the ALJ erred in concluding that Plaintiff was exaggerating his symptoms in the absence of treating source evidence to this effect, the ALJ's credibility determination had a second and legally adequate basis. By detailing the inconsistencies in Plaintiff's statements about his symptoms and functional limitations when measured against the substantial record evidence showing that Plaintiff's mental health impairment responded well to medication, the ALJ provided an alternative and valid reason for his credibility determination. *See Bourinot v. Colvin*, 95 F. Supp. 3d 161, 181-82 (D. Mass. 2015) (ALJ's credibility determination properly supported by contradictions between claimant's statements about severity of her pain and contents of medical records). As long as an ALJ provides at least one legally sufficient reason for his or her credibility determination, that determination will be upheld. *See Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1227 (9th Cir. 2009) (even when one of ALJ's stated reasons for disbelieving a claimant is not supported by the record, the error is

harmless as long as another stated reason is supported by the record); *cf. Gonzalez v. Astrue*, C.V. No. 11-30201-KPN, 2012 WL 2914453, at *3 (D. Mass. July 5, 2012) (discussing ALJ's assignment of weight to medical source opinion; holding that even if one reason for affording opinion evidence little weight was improper, ALJ's treatment of opinion will be sustained if other stated reason is proper and adequately supported).

    2.  <u>The ALJ Did Not Err in his Treatment of Medical Opinion Evidence</u>

    Plaintiff's challenge to the ALJ's treatment of "the medical opinions" of Dr. Estes, Ms. Rivera, and Dr. Redstone is that the ALJ violated the treating physician rule when he failed to accord controlling weight to the opinion signed by Dr. Redstone (and Ms. Rivera) (Dkt. No. 19 at 9-12), and failed to give appropriate weight to the opinions of Dr. Estes and Ms. Rivera, which, he contends, must be evaluated using factors similar to those used when "evaluating any medical opinion" (*id.* at 12-14).  As to Dr. Redstone, the Commissioner argues, with some force, that he was not a treating physician whose opinion was presumptively entitled to controlling weight (Dkt. No. 24 at 9-10).  Even if it was, the Commissioner's argument continues, the ALJ articulated legally sufficient reasons for declining to accord controlling weight – or any weight – to opinion evidence from Dr. Redstone, Ms. Rivera, and Dr. Estes and those reasons pass muster (*id.* at 10-15).

    "An ALJ must 'always consider the medical opinions in [the] case record, 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources.  *See* 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1) (stating that "[g]enerally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you"); *see also Johnson*, 2016 WL 4639134, at *8.  While "[c]ontrolling weight" is generally given to a treating physician's opinion, *see, e.g., Arruda v. Barnhart*, 314 F. Supp.

2d 52, 72 (D. Mass. 2004), however, "[t]he law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991); *Arruda*, 314 F. Supp. 2d at 72.  Controlling weight is generally given to a treating physician's opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record.  20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).

> Where controlling weight is not given to a treating source opinion, the ALJ considers an array of factors to determine what weight to grant the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the degree to which the opinion can be supported by relevant evidence, and the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6).  Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Johnson*, 2016 WL 4639134, at *8.  "'Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve.'"  *Id.* (quoting *Roshi v. Comm'r of Soc. Sec.*, Civil Action No. 14-10705-JGD, 2015 WL 6454798, at *6 (D. Mass. Oct. 26 2015)).  Assuming that Dr. Redstone functioned as a treating physician,[11] the ALJ declined to give controlling, or any, weight to Dr. Redstone's findings for reasons the ALJ explained in his

---

[11] The Administrative Record does not contain any document showing that Dr. Redstone ever met Plaintiff.  Although the ALJ might have addressed the weight he was assigning to Dr. Redstone's opinion based of the length of the treatment relationship (short at best) and frequency of examination (possibly never), he made no reference to this factor in his decision (A.R. at 23, 27).  "[A]n agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'"  *Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 397 (1974) (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168-69 (1962)).  Accordingly, Plaintiff's contention that the ALJ had an obligation to request additional information from Dr. Redstone about the extent of his treating relationship with Plaintiff, if any, misses the mark and need not be addressed by the court (Dkt. No. 27 at 5-6).

credibility analysis, which are discussed above (A.R. at 23, 25).  Because the ALJ supported his

rejection of the treating physician's opinions with express references to inconsistencies between

those opinions and other portions of the record, and because resolving those inconsistencies was

the purview of the ALJ, his decision to grant no weight to the treating physician's opinions did

not constitute error.  *See Johnson*, 2016 WL 4639134, at *8.

The ALJ was required to consider all of the medical opinions in the record, and, as

previously noted, SSA regulations "prioritize the opinions of a claimant's treating sources,"

*Bourinot*, 95 F. Supp. 3d at 175 (citing 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1)), such as Ms.

Rivera.  Nonetheless, "[t]he regulations allow the ALJ to discount the weight given to a treating

source opinion where it is inconsistent with other substantial evidence in the record including

treatment notes and evaluations by examining and non-examining physicians."  *Id.*  The ALJ was

entitled to discount Ms. Rivera's evidence on the basis that it was inconsistent with medical

records of other treating sources, as he did.  *See id.* at 176.  As to Dr. Estes, as an initial matter,

she does not appear to have concluded that Plaintiff's mental health impairments presented a

barrier to his ability to work.  She reported the results of the mini-mental status examination she

administered as showing that Plaintiff was in the "mildly impaired range," and further found that

"his attention, concentration, as well as his memory do appear slightly problematic" (A.R. at

349).  In any event, Dr. Estes was "an independent medical examiner rather than a treating

physician . . . Therefore, the ALJ was not required to give controlling weight to [her] opinions or

even provide good reasons for failing to adopt them."  *Arrington v. Colvin*, Civil Action No. 15-

10158-JGD, 2016 WL 6561550, at *17 (D. Mass. Nov. 3, 2016).

Moreover, "there is no question that the ALJ may rely on reports from non-treating

physicians when they are more consistent with the record than reports provided by treating

physicians." *Sokolovskaya v. Colvin*, 187 F. Supp. 3d 324, 334 (D. Mass. 2016) (citing *Berrios-Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991); *DiVirgilio v. Apfel*, 21 F. Supp. 2d 76, 80-81 (D. Mass. 1998)).  The ALJ did not substitute his own lay opinion for opinions offered by Dr. Redstone, Dr. Estes and Ms. Rivera.  Rather, he gave great weight to, and relied upon, mental RFCs prepared by Dr. Sullivan and Dr. Litchman, both non-examining, non-testifying psychologists (A.R. at 23, 54-63, 64-76).  These reports "reflect[] a significant level of attention and thought afforded by the [psychologists] to their assessments," *Arruda*, 314 F. Supp. 2d at 75, particularly with respect to Plaintiff's limitations in concentration and persistence and his social interaction limitations (A.R. at 61, 72-73).  The ALJ did not err by affording these opinions "great weight."  *See Arrington*, 2016 WL 6561550, at *15 (ALJ entitled to give "great weight" to opinion evidence from non-examining, non-testifying state agency physician and her opinion constituted substantial evidence supporting the ALJ's determination).

Nor did the ALJ err by relying, to the limited extent that he did so, on the GAF scores assigned to Plaintiff by care providers at Gandara as a reason for rejecting the opinion evidence of Dr. Redstone and Ms. Rivera. "The GAF scale provides a '"rough estimate" of an individual's psychological, social, and occupational functioning.'" *Bourinot*, 95 F. Supp. 3d at 178 (quoting *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998)).  It is true, as Plaintiff contends, that the GAF scale has "recently fallen into disfavor as an assessment tool . . . '[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed.'" *Id.* (citing *Kroh v. Colvin*, No. 13-CV-01533, 2014 WL 43844675, at *17 (M.D. Pa. Sept. 4, 2014)). Nonetheless, the SSA has announced that it "will continue to receive and consider GAF scores just as it would other opinion evidence, but scores must have supporting evidence to be given significant weight." *Id.* (citing *Kroh*, 2014 WL 4384675, at *18; *Lane v. Colvin,* No. C13-5658-

MJP, 2014 WL 1912065, at *9 (W.D. Wash. May 12, 2014)).  The GAF scores in Gandara's

records had supporting weight in the narrative and other information in Gandara's records and

"the ALJ's reliance on the scores in this case was not in error."  *Id.* (not error for ALJ to rely on a

range of GAF scores that were adjusted over time by mental health care provider).

It is the ALJ's responsibility, not the responsibility of this court, to resolve conflicts in

the evidence, including in opinion evidence, and draw reasonable inferences from the record.

Because the ALJ did so in this case, his refusal to give weight to the opinion evidence from Dr.

Redstone, Dr. Estes and Ms. Rivera was not error.  *See, e.g., Arrington*, 2016 WL 6561559, at

*18; *Bourinot*, 95 F. Supp. 3d at 178-79.

3.  <u>The ALJ's Failure to Explicitly Address Plaintiff's Mother's Statement
    Does Not Necessitate Remand</u>

Plaintiff contends that remand is required because the ALJ failed to make specific

reference to the statement submitted by Plaintiff's mother and the failure was prejudicial

because, according to Plaintiff, the ALJ drew a negative inference "based [on] non compliance

(sic) with medical treatment" (Dkt. No. 19 at 15).  The Commissioner argues that the ALJ was

not required to explain what weight, if any, he assigned to the letter, and, in any event, Plaintiff

has failed to show prejudice from the ALJ's failure to explicitly address the letter because it was

cumulative of Plaintiff's own testimony.  The Commissioner has the better of the arguments.

The ALJ was required to consider all of the evidence in the record.  *See* SSR 06-03p,

2006 WL 2329939, at *4 (Aug. 9, 2006).  With respect to evidence from "other sources," such as

statements from family members, SSR 06-03p provides, in relevant part, that "an adjudicator

generally should . . . ensure that the discussion of the evidence in the determination or decision

allows a claimant or subsequent reviewer to the follow the adjudicator's reasoning, when such

opinions may have an effect on the outcome of the case."  *Id.*  An "'ALJ is not required to

discuss every piece of evidence in the record when making his or her decision.'" *Bonner v. Colvin*, 153 F. Supp. 3d 465, 476 (D. Mass. 2015) (quoting *Nadeau v. Colvin*, No. CIV A. 14-10160-FDS, 2015 WL 1308916, at *11 (D. Mass. Mar. 24, 2015)); *Cox v. Astrue*, Civil Action No. 08-10400-DPW, 2009 WL 189958, at *5 (D. Mass. Jan. 16, 2009) (same; citing cases).

Here, the ALJ represented that he considered the entire record (A.R. at 19). The transcript of the hearing confirms that the ALJ was aware of the letter from Plaintiff's mother. At the outset of the hearing, in a colloquy with counsel, the ALJ noted that there was a letter from the claimant's mother that he would need to have translated (*id.* at 36), and he did so (*id.* at 613). Plaintiff's counsel discussed the mother's evidence in his opening statement (*id.* at 38), and there was a further colloquy between counsel and the ALJ about the letter immediately before the VE testified (*id.* at 47). In light of the contents of the hearing transcript, there is no reason to believe that the ALJ failed in his duty to consider all of the record evidence.

Further, Plaintiff's claim that this evidence was critical fails because the ALJ did not question Plaintiff's credibility based on a failure to seek and comply with medical advice. To the contrary, the records show that Plaintiff has consistently sought treatment for his mental health impairments, and has generally taken his medications. When he was incarcerated at the Ludlow Correctional Center, Plaintiff reported that it took a long time to find the right combination of medications that could manage his symptoms, but the medications he was taking had been helpful since 2008 (A.R. at 340). What the ALJ found was that Plaintiff had severe mental health impairments that, his medical records showed, responded well enough to treatment that Plaintiff did not experience the symptoms and functional limitations that he reported to Ms. Rivera and Dr. Estes and testified to at the hearing as long as he took his medication. He was purportedly taking his medication while treating with Ms. Rivera and at the time of the hearing.

Plaintiff's mother's statement was generally similar to and cumulative of Plaintiff's testimony, and the ALJ's explanation of his reasons for declining to find Plaintiff credible were clearly explained.  It is apparent from the ALJ's decision that the mother's statement would not "have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *4.  It would serve no purpose to remand this case so that the ALJ could explain that, just as he did not credit Plaintiff's testimony about the severity of his symptoms and functional limitations at the time of the hearing, he would not credit the mother's description of her son's condition to the extent it was inconsistent with the longitudinal medical evidence of record.  *See Sanchez v. Colvin*, 134 F. Supp. 3d 605, 619 n.9 (D. Mass. 2015) (no reason to remand for reconsideration based on an ALJ's failure to explain the weight he assigned to other source evidence when that other source evidence was cumulative of the claimant's own testimony) (citing *Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011)).

      4.  <u>Plaintiff's Reasons for Changing Providers Was Not Material to
          the ALJ's Credibility Determination</u>

Plaintiff contends that the ALJ "sandbagged" him by inferring that he changed mental health care providers – from Gandara to Valley Psychiatric Services, Inc. – to improve his chances of obtaining benefits without giving Plaintiff a chance to explain his reasons for the change (Dkt. No. 19 at 17-18).  The factual premise of Plaintiff's contention is not borne out by the ALJ's decision.  The essential underpinning of the ALJ's credibility determination was not Plaintiff's change in providers, which the ALJ referred to as "suspect" only in a footnote (A.R. at 26 n.3).   Rather, the ALJ focused on the inconsistencies between, on the one hand, Plaintiff's medical records from Gandara and his statements during the forensic mental status examination at the Ludlow Correctional Center, and, on the other hand, his statements to Ms. Rivera about his mental health status shortly thereafter as reflected in the records from Valley Psychiatric

Services, Inc.  "The law has placed the onus . . .  on the ALJ to develop the record where it is

incomplete."  *Cox*, 2009 WL 189958, at *7 (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

1998)).  When, as in this case, the record is adequate to resolve a claim, the ALJ is not required

to seek supplementation, and he had no obligation in this case to inquire why Plaintiff changed

mental health care providers.  *See id.*

       5.   The Failure to Translate Portions of the Plaintiff's Medical Records
            Does not Require Remand

Finally, Plaintiff contends that the case should be remanded because some of Plaintiff's

medical records were submitted to the SSA in Spanish and were not translated.  More

specifically, he points to a portion of a 1999 record from a psychiatric hospitalization in Puerto

Rico, and a 2013 letter from a physician of internal medicine, who treated Plaintiff when he was

between the ages of 10 and 15, and purportedly represented that his behavior had always been

very strange and unusual (Dkt. No. 19 at 3-4).  It is obviously preferable that all of the evidence

submitted in support of an application for social security benefits be available for review by the

ALJ hearing the case.  At the outset of the hearing, the ALJ acknowledged the need to obtain

translations of exhibits and stated that he would keep the record open and get the exhibits

translated (A.R. at 36-37).  Most of the records were, in fact, translated (Dkt. No. 12-1).

In the court's view, whether remand for translation is required turns again on the question

of when an ALJ is required to seek supplementation of the record.  When the existing record is

adequate to resolve the claim, the ALJ is not required to do more.  *See Cox*, 2009 WL 189958, at

*7; *cf. Austin v. Barnhart*, No. 03-156-B-W., 2004 WL 1896999, at *2 (D. Me. Aug. 25, 2004)

(holding that an ALJ is only required to order a consultative examination when the medical

evidence before the ALJ on a particular impairment is insufficient to support a conclusion on the

question of disability).[12]  None of the cases cited by Plaintiff stand for the proposition that a failure to translate a small portion of the exhibits in the administrative record automatically requires remand.  So far as the court has been able to determine, there are no cases holding that a failure to complete the translation of all of the exhibits in a case file is a *per se* basis for remand. Rather, the cases generally address shortcomings in the record in terms of the materiality of the missing evidence.  *See Conner v.* Barnhart, 443 F. Supp. 2d 131, 134 (D. Mass. 2006) (case should be remanded to Commissioner to consider new evidence only when that evidence is material; evidence is material if the ALJ's decision might reasonably have been different were it considered) (citing *Evangelista v. Sec. of Health & Human Servs.*, 826 F.2d 136, 140 (1st Cir. 1983)).

Here, Plaintiff has not even argued that he was prejudiced by the absence of translations of these two small portions of the record and the record shows otherwise.  The ALJ already had the essential information contained in these exhibits before him in a different form. Acknowledging that the records from Plaintiff's 1999 psychiatric hospitalization were partially illegible, Plaintiff's counsel, in his hearing brief, translated an untranslated portion of the 1999 records that supported Plaintiff's statements that he suffered audio and visual hallucinations that directed him to cause harm to himself and others, and that he had attempted suicide (A.R. at 279-80).  The hearing brief, with the translation, was before the ALJ (*id.* at 39-40).  Further, the

---

[12] Plaintiff's apparent claim, made for the first time in his reply memorandum, that the ALJ was required to order a consultative examination because psychologist J. Litchman, one of the non-testifying, non-examining psychologists, stated that a CE was necessary to accurately diagnose Plaintiff's impairment fails because "the decision as to whether or not to utilize a medical expert is within the ALJ's discretion and the failure to do so is not *per se* a basis for reversal."  *Bianco v. Astrue*, No. C.A. 09-021S, 2010 WL 2382855, at *10 (D.R.I. Apr. 20, 2010) (citing *Hodgkins v. Barnhart*, No. 03-179-P-4, 2004 WL 1896996 (D. Me. Aug. 25, 2004)).  Because substantial evidence in the record supported the ALJ's ultimate determination, the lack of a consultative examination does not require reversal.  *See id.*

information from the 1999 hospitalization was largely cumulative.  The hearing brief highlighted an entry in English from a subsequent psychiatric hospitalization in 2007 that included very similar content (*id.* at 40).  As to the childhood onset of Plaintiff's mental health problems, the information purportedly included in the letter from Plaintiff's childhood doctor, Plaintiff testified that he always heard voices since he was little (*id.* at 46), and his mother's letter substantiated an early onset of his problems (*id.* at 613).  Where no showing of prejudice is made, reversal and remand are not required.  *See Cox*, 2009 WL 189958, at *8; *see also Conner*, 443 F. Supp. 2d at 134.

In summary, there was substantial evidence in the record supporting the ALJ's conclusion that notwithstanding Plaintiff's severe mental health impairments, he suffered moderate symptoms and was able to function when he took his medication, as he generally did. In these circumstances, the ALJ's determination that Plaintiff was not disabled is sufficiently supported by the record and is entitled to deference.  *See, e.g., Bianco*, 2010 WL 2382855, at *12.

B.  CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision is DENIED, and the Commissioner's motion to affirm the decision is GRANTED.  Judgment shall enter for the defendant, and the Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

Dated: March 31, 2017                          Katherine A. Robertson
                                               KATHERINE A. ROBERTSON
                                               UNITED STATES MAGISTRATE JUDGE